UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ERDEN ARKAN,<br><br>                        Defendant. | Docket No.: 0208 1:25CR00013- 001 (DEH)<br><br>**DEFENDANT'S SENTENCING<br>MEMORANDUM**<br><br>Sentence Date: 08/15/2025 |

Dated: August 1, 2025

Jonathan Rosen, Esq.
Potomac Law Group, PLLC
1717 Pennsylvania Avenue, NW, Suite 1025
Washington, DC 20006
Tel: (202) 321-3416 Fax: (202) 318-7707
jrosen@potomaclaw.com

*Counsel for Erden Arkan*

# TABLE OF CONTENTS

I.    MR. ARKAN'S PERSONAL HISTORY ...................................................... 2

    A.    Erden's Background, Education and Family ..................................... 2

    B.    Erden's Servant Leadership in Construction ................................... 8

        1.    Early Work History ............................................................. 8

        2.    KISKA-USA .......................................................................... 9

        3.    KSK ........................................................................................ 9

        4.    Erden's Personal Values as Construction Executive ................. 9

    C.    Mentoring and Acts of Charity ..................................................... 11

    D.    Charitable Works ........................................................................... 14

    E.    Collateral Consequences .............................................................. 15

II.   THE GUIDELINES RECOMMENDATION OF PROBATION IS REASONABLE .... 17

    A.    Applicable Legal Standard ............................................................ 17

    B.    The Conduct at Issue .................................................................... 17

        1.    Erden's Motive to Host Fundraiser ....................................... 17

        2.    Erden's Motive to Use Straw Donors .................................... 18

    C.    The Unprecedented Posture of this Case ..................................... 20

III.  CONCLUSION ................................................................................... 22

The defense respectfully submits this sentencing memorandum on behalf of Erden Arkan ("Erden" or "Mr. Arkan"), an extraordinarily good and impactful person who deeply regrets his decisions that led to the charge and conviction in this case. For the reasons set forth below, we request that the Court accept the recommendation of The United States Probation and impose a Guidelines sentence of one year probation.

Until this case, Mr. Arkan was widely regarded as a respected civic leader — generous with his time, steadfast in his principles, and a source of support to many. A revered figure in the Turkish American community, known by the honorific "Abi," or "older brother," Mr. Arkan now bears the painful stigma of a felony conviction. He has already been punished significantly for his conduct. He has let down the many individuals who saw Erden as their advocate, mentor and benefactor and the countless others who took pride in Erden's rise as a renowned Turkish American leader who did great things for the City of New York. He and his family have had to deal with the pain, anxiety, and shame of his criminal conviction.

Erden comes before the Court for sentencing after having accepted responsibility for the charge which arose from an aberrational detour in an otherwise honorable life. He recognizes that he exercised poor judgment in personally funding approximately $12,450 in straw donations to the 2021 mayoral campaign of Eric Adams ("campaign"). However, Mr. Arkan's offense of conviction stands in stark contrast to his otherwise exemplary life and the remarkable good will that is still felt throughout the Turkish American community, and more, generally, the City of New York today because of his leadership.

On July 28, 2025, Mr. Arkan and his counsel received a copy of the Probation Department's final Presentence Investigation Reports (collectively, the "PSR") and Sentencing Recommendation. The defense respectfully submits that Erden's lifetime record of service,

1

together with all the other mitigating factors set forth herein, warrant a guidelines sentence of one year probation.

**I.      Mr. Arkan's Personal History**

Mr. Arkan is best described as an extremely hard worker who is extraordinarily dedicated to his family, community, and city.  A first-generation immigrant, he comes from a modest background, and has always been generous with others, whether it be employees, interns, relations of friends, or complete strangers, both with his time and resources.  As a result, Erden enjoys the friendship and support of many people, and for that he considers himself to be an incredibly lucky man.

**A.      Erden's Background, Education and Family**

Erden was born in Turkey in 1949 (PSR ¶ 30).  He is 76 years old.  He is the youngest of two children born to Nevzat Arkan and Rikkat Arkan (*Id.*)  His sole sibling, Aydan Atamer, is four years older than Erden.  (*Id.*)

The Arkans were a tight knit family with an exceptionally strong work ethic.  Erden's father and mother were born and raised in Istanbul, Turkey.  (Lttr. of Aydan Atamer, attached hereto as Ex. 1.)  Erden's father graduated from the Turkish military academy, where he served until his retirement as a Colonel.  Along with Erden's paternal grandmother, Meliha Arkan, Erden's mother helped raise Erden and his sister. (*Id.*)

In three ways, Erden learned from his family how to live a life of purpose.  First, there is no substitute for hard and honest work.  Aydan Atamer recalls that everyone was expected to work for what they received.

> Erden and I were born to working parents.  We were never poor, always adequately fed and clothed.  But neither were we rich, we rarely had luxuries other than a good meal.  We were taught from early childhood that everything

had to be earned. . . . Shortcuts were not tolerated – doing a task properly mattered more than doing it quickly. (*Id.*)

At an early age, Erden was expected to do whatever the family needed. (*Id.*) In the Arkan household, nothing was given outright.

Second, education "was the foundation for success." (*Id.*) Erden was enrolled in the nearby elementary school, where "his inquisitiveness made Erden a strong student." (*Id.*) In school, Erden "especially enjoyed drawing and seeing how things work on the inside." (*Id.*) More important than his early track record as a student, his family instilled in Erden a lifelong belief that education "was a source of stability." (*Id.*)

Third, no person is an island. The Arkans felt a personal responsibility to lift up those around them. In addition to being the family disciplinarian, Erden's father "was a man of service who devoted his career to defending and improving life in [Turkey]." (*Id.*) Growing up, Erden witnessed his father leverage his service in the military to improve the lives of others. At home, Erden's mother devoted herself to her children, especially through her love of cooking. (*Id.*) More than a doting presence in his life, Erden's mother made Erden feel safe. (*Id.*)

Bearing responsibility for others meant creating opportunities for those in need. After graduating from high school, "while most of his peers went straight to college, Erden took a year off – he went sailing and struggle to focus, even failing his first college entrance exam." (*Id.*) Erden failed that exam because he did not study. With the doors to career advancement closing, Erden's grandmother, with whom he had shared a bedroom until he was fifteen and was remarkably close, helped Erden "discover his resilience and discipline." (*Id.*) Under her guidance, Erden "studied hard, reapplied, and was admitted to Istanbul Technical University (ITU), a very prestigious school in Turkey, where he earned his degree in architecture." (*Id.*) Bearing witness

to his grandmother's love and support when he was most vulnerable, Erden learned first-hand the redemptive power of opportunity and bearing responsibility for others.

During college, Erden continued to rely on his family values to live a purposeful life. In college, Erden met his wife, Itir, whom he married in 1973. (PSR ¶ 32.) As the younger sister of a classmate, Itir fell in love with Erden because, soon after meeting him, she "quickly appreciated that Erden was not only the most hard-working person I had ever met but also one of the kindest." (Lttr. of Itir Arkan, attached hereto as Ex. 2.) "I never saw Erden belittle or make derogatory comments about anyone. . . . Erden made me feel grateful for the goodness in my life." (*Id.*) Equally important, Erden believed that "every person, regardless of gender, had potential and, from the very beginning, promised to be my biggest supporter." (*Id.*)

Itir writes that Erden "kept his promise." (*Id.*) At the request of Itir's father, Erden delayed the marriage to allow Itir to complete her undergraduate degree. (*Id.*) Years later, Erden provided her "the emotional and financial support" to obtain a Master's in Education from Columbia University (*Id.*)

> Twice a week for several years, [Erden] drove me from our home in midtown to my evening classes and waited patiently in the car for two hours while I attended lectures. He did this while also launching a new business and being a tremendous father to our two children. (*Id.*)

As ███████████████████████████████, Itir "take[s] pride in having helped shepherd generations of young women into math and STEM careers." (*Id.*) Her pride is mixed with gratitude to Erden, "who always championed my career, my dreams, and my independence." (*Id.*)

Erden and Itir are the proud parents of two adult children, Gunce and Canem. Despite Erden's working "grueling hours," Itir notes that Erden has always been incredibly involved in the

children's upbringing. (*Id*.) As their children grew up and Erden's work demands became increasingly intense, Itir notes that "family came first" to Erden. (*Id*.)

Erden dedicated himself to ensuring that his children felt the same love, security, and respect which he had received from his parents and grandmother. Reflecting on her childhood, Gunce fondly recalls her father's physical presence, including his regularly cooking breakfast for herself and her sister, preparing their lunches and driving them to school. (Lttr. of Gunce Arkan, attached hereto as Ex. 3.) Growing up in Turkey, however, was not easy for Gunce who "struggled profoundly in school." (*Id*.) ███████████████ Gunce was unable to read or write until eight years of age and was dismissed by her teachers as "slow." (*Id*.) She credits her parents with having an "instinctive" understanding that "something deeper was going on" and with moving the family to the United States ████████████████████████████████████ ██████.[1] (*Id*.) A graduate of Stanford and Harvard, Gunce writes that "[n]one of [my success] would have been possible without the enormous sacrifice and unwavering belief of my parents." (*Id*.)

Canem describes her father's doting presence and support, which was crucial to her sense of security upon her arrival in the United States. Despite her father's "increased workload," Canem recalls how her father "never stopped cooking for us." (Lttr. of Canem Arkan, attached hereto as Ex. 4.) Crediting her father for his "tireless work ethic" with which he built "a life from scratch," Canem expresses her gratitude to him for enabling her to become an Ivy League graduate and Wall Street financier. (*Id*.)

---

[1] Itir was born in the United States where her father once served as a professor at Princeton University. Her status as a U.S. citizen enabled Erden and his family to immigrate legally to the United States in 1986. (Lttr. of Itir Arkan, attached hereto as Ex. 2.)

In addition to personal achievement, both daughters describe their father's impact on their character. Teaching both daughters to be "active citizens," Erden taught that "small actions nevertheless felt big because they connected me to something larger than myself." (Lttr. of Gunce Arkan, attached hereto as Ex. 3.)

While supporting his wife and children, Erden also helped his mother and sibling. Erden constantly doted on his mother, whom he continued to call, visit, and financially support after emigrating to the United States. (Lttr. of Itir Arkan, attached hereto as Ex. 2.) In 1997, when Erden's mother became ill, Erden arranged for her travel to the United States, where she received state of the art care at Mt. Sinai. Diagnosed with colon cancer, she convalesced at Erden's home after surgery, where Erden hosted his extended family, including his two nieces, Simge Atamer and Selin Kohen, at his home. (*Id*.) Simge writes that Erden demonstrated an "unwavering care and dedication," which extended his mother's live by two years more than her doctors had predicted. (Lttr. of Simge Atamer, attached hereto as Ex. 5.) In addition, Ayden Atamer recalls Erden's generosity after the loss of her husband and his continued support of her to the present day. "I genuinely do not know what my daughters and I would have done without him." (*Id*.)

Erden's kindness has impacted the next generation of family members and beyond. In addition to cooking for both her and her brother, Erden's eldest grandchild, A.R., writes that her "Dede" "would drive miles just to bring us four blocks to school every day. . . ." (Lttr. of A.R., attached hereto as Ex. 6.) Gunce's husband, Mark Rosen, observes that, despite their vastly different backgrounds and cultures, his father and Erden "bonded over family." (Lttr. of Mark Rosen, attached hereto as Ex. 7.) Mark's sister, Mindy Schechter, describes how Erden always treated her children, now in their 30s, as his own. (Lttr. of Mindy Schechter, attached hereto as

Ex. 8.) Erden's "lived lesson" to Michael Cawthon, Canem's husband, is this: "true wealth comes from family." (Lttr. of Michael Cawthon, attached hereto as Ex. 9.)

In addition, Erden cares for both the family of his friends and the friends of his family. The son of Erden's "best friend" from their days at ITU, Deniz Tortop describes Erden's "profound impact" on him as a mentor who taught him how to be a parent and adjust to the United States after emigrating from Turkey. (Lttr. of Deniz Tortop, attached hereto as Ex. 10.) Gunce's classmate, Sabrina Weaver, poignantly writes about her dysfunctional family and the life-enduring impacts of becoming Erden's "third daughter." (Lttr. of Sabrina Weaver, attached hereto as Ex. 11.) According to Ms. Weaver, Erden "lives to help, support and better the [lives] of others." (*Id*.)

Erden celebrates his family and friends in good times and bad times. Unbounded by geography, Erden flies to Turkey for family celebrations (Lttr. of Selin Kohen, attached hereto as Ex. 12.) and crises, where he has served as a "second father" to his grieving nieces after the sudden death of their father. (*Id*.) In Turkey, he continues to visit with an ailing friend, now in a nursing home, and lonely old neighbors. (Lttr. of Aydan Atamer, attached hereto as Ex. 1.) Wherever he is and no matter what the occasion, Erden's cooking and kindness makes everyone, as noted by his grandnephew, Aksel Kohen, feel "seen and loved." (Lttr. of Aksel Kohen, attached here to as Ex. 13.) As Aydan anticipates her 80th birthday celebration in Turkey in November 2025, she notes how painful it would be if Erden, her "last living member of my original small family," was not present. (Lttr. of Aydan Atamer, attached hereto as Ex. 1.)

Itir describes Erden as her "rock" and "the glue that holds our family together." (Lttr. of Itir Arkan, attached hereto as Ex. 2.) She discusses the stress that the family is under because of this case and the toll it has taken on her, Erden, and their entire family. (*Id*.) Nevertheless,

"[t]hrough it all, Erden has been there for all of us, doing his best to make sure that life continues for all of us as normally as possible."  (*Id*.)

## B.  <u>Erden's Servant Leadership in Construction</u>

Erden's work history underscores his commitment to living a purposeful life.  After graduating from ITU in 1971 with a degree in architecture (PSR ¶ 45), Erden worked in the construction industry as a project manager on complex infrastructure projects.  (*Id*. at ¶ 48.)  Like his father, Erden acted with perseverance and integrity to leverage his personal achievements into something greater than himself.  Empowering a diverse coalition of individual employees and subcontractors, Erden's growth as a successful entrepreneur helped create economic opportunities for countless individuals, beautify the landscape of New York City, and improve the lives of its residents.

### 1.  Early Work History

Immediately after graduating from ITU, Erden worked as project manager for KISKA Construction Corporation ("KISKA"), a Turkish-based construction company which specialized in challenging infrastructure projects throughout Turkey and the Middle East.  (Lttr. of Itir Arkan, attached hereto as Ex. 2.)  At KISKA, Erden was mentored by its owner, Oguz Gursel, who taught Erden learned that "honor and effort were inseparable."  (*Id*.)  Erden helped build a U.S. army base in Turkey, large-scale water treatment plants in Turkey and an "ambitious agricultural project in war-torn Iraq."  (*Id*.)

From afar, Turkish American real estate developers in New York City, including Mahir Furton, took note of Erden's "strong reputation" as a project manager.  (Lttr. of Mahir Furtun, attached hereto as Ex. 14.)  Erden's reputation was well justified.  He frequently worked "sixteen to twenty-four hour days, often including weekends."  (Lttr. of Itir Arkan, attached hereto as Ex. 2.)  In addition, Erden was successfully managing individuals from all walks of life, especially in

Iraq. (*Id*.) Consistent with his long-held belief that "character is not defined by face, creed or religion," (Lttr. of Gunce Arkan, attached hereto as Ex. 4), Erden used his individual success to provide cohesion and strength for others through organization.

### 2. KISKA-USA

At the end of 1986, at Mr. Gursel's request, Erden and his family emigrated to the United States where Erden started a KISKA subsidiary ("KISKA-USA"). (Lttr. of Itir Arkan, attached hereto as Ex. 2.) As President of KISKA-USA, Erden turned a startup into a company generating almost a billion dollars in revenue. (KISKA-USA brochure, attached hereto as Ex. 15.) Under Erden's leadership, KISKA-USA made a vital contribution to New York City's public infrastructure and skyline, including the construction of water tunnel shafts, rehabilitation of New York's busiest bridges and preservation of historically significant buildings. (*Id*.) In addition, Erden's company built a substantial part of the High Line. (*Id.; see also* Lttr. of Itir Arkan, attached hereto as Ex. 2.) KISKA USA's work has received many awards. (*Id*.)

### 3. KSK

In 2003, with his health declining, Mr. Gursel encouraged Erden to start a new company. Thereafter, Erden co-founded KSK Construction Group LLC ("KSK"), a construction manager for development projects on realty owned by third parties. (PSR ¶ 49). Since its founding, KSK has performed multiple projects generating over $1B in revenue. (KSK Schedule, attached hereto as Ex. 16.) KSK's projects included affordable housing and energy efficient buildings. (Lttr. of Ben Ohebshalom, attached hereto as Ex. 17.)

### 4. Erden's Personal Values as Construction Executive

In the following three ways, Erden's professional work reflects his values to live a purposeful life.

First, Erden exuded a passion for creating opportunities for others.  According to Murat Agirnasli, a KSK partner,

> Many students would send him their CVs . . .  Without fail, Erden would take the time to read every application, often meeting with the individuals personally to hear their stories, understand their goals, and offer thoughtful, practical support.  He approached each case with care, humility, and genuine joy, always striving to help these young people find their first footing in life. He never expected anything in return.

(Lttr. of Murat Agirnasli, attached hereto as Ex. 18.)

"[Erden's] philosophy was simple and profound: 'Let us not forget that every young individual we help with an opportunity may one day help make this world a better place.'"  (*Id*.)

Erden's generosity made dreams come true for countless young contractors and employees. One entrepreneur, Emre Akcabay, describes Erden's "instrumental" support with "valuable business opportunities" after he left his old employer to start his own company.  (Lttr. of Emre Akcabay, attached hereto as Ex. 19.)   An employee, Yasemin Akcabay, credits Erden for "launching" her career and her husband's.  (Lttr. of Yasemin Akcabay, attached hereto as Ex. 20.) Ms. Akcabay writes that Erden personally taught her how to be successful in her job.  According to Ms. Akcabay, Erden "is an incredibly kind leader who is always willing to help young employees reach their full potential."  (*Id*.)

Second, Erden always conducted his business with "unwavering integrity."  (Lttr. of Mahir Furtun, attached hereto as Ex.14.)  According to Mr. Furtun,

> [Erden] approached every challenge with a quiet determination and an ethical compass that guided his decisions. I witnessed him handle complex situations with fairness and respect for everyone involved, always prioritizing honesty and doing the right thing, even when it was difficult  (*Id*.)

According to one employee, Claudio Ortega, "[Erden"] always protects us" because "[h]e is very strict about workplace safety."  (Lttr. of Claudio Ortega, attached hereto as Ex. 21.)   Another

employee, Edgar Tellez, writes that Erden paid for his employees to complete a "10-to-30-hour OSHA Outreach Training course." (Lttr. of Edgar Tellez, attached hereto as Ex. 22.)

Third, Erden treated everyone with dignity. He paid employees who could not work during COVID their full salary and helping them with their immigration needs (*id*.), hired the ailing spouse of an employee and cared for that same employee after her spouse's death (Lttr. of Patricia Rice, attached hereto as Ex. 23) and made an interest-free loan and offered other support for others to buy their first home. (*See, e.g.*, Lttr. of Bingol Koksaldi, attached hereto as Ex. 24.) A contractor, Ayhan Ozan, states that Erden treated "everyone as if they were family." (Lttr. of Ayhan Ozan, attached hereto as Ex. 25.) According to Ms. Akcabay, Erden treated her like "a daughter." (Lttr. of Yasemin Akcabay, attached hereto as Ex. 20.) Another employee, Alev Dundar, writes that Erden provided "thoughtful gifts to family-friendly work events, where he would often be found cheerfully manning the grill." (Lttr. of Alev Dundar, attached hereto as Ex. 26.)

Erden's focus on individual dignity extended to those whom he would never meet but nevertheless depended on him. Deviating from "the industry norm," Erden insisted that affordable units within a residential structure "be of equal quality to the market-rate apartments." (Lttr. of Ben Ohebshalom, attached hereto as Ex. 17.) "Erden believed deeply that lower income tenants deserved dignity, beauty, and comfort just like anyone else." (*Id*.) Similarly, Erden was the "driving force" behind "sustainable development," which Erden saw "as his duty to future generations." (*Id*.)

## C.   Mentoring and Acts of Charity

Beyond his workplace, Erden made it a practice to pay forward the success that he has enjoyed in life by mentoring young people and offering help to individuals in need.

Erden's mentorships reflect his sincere commitment to community service. Mr. Ozan describes Erden's "deep generosity of spirit" over "multiple meetings to walk me through the intricacies of the process" during his venture into the "risky world of real estate development." (Lttr. of Ayhan Ozan, attached hereto as Ex. 25.) Another mentee, Funda Durukan, writes that, Erden was "an incredible source of support" when she was launching her business. (Lttr. of Funda Durukan, attached hereto as Ex. 27.)

Letters from additional mentees demonstrate that Erden's generosity goes far beyond help with securing employment. Gokay Mediceler describes Erden as a "fatherly figure and a role model to the younger generation" for whom he is "a mentor at work and in life." (Lttr. of Gokay Mediceler, attached hereto as Ex. 28.) Metin Ozkuzey expresses his gratitude for Erden's "unprompted generosity" which "sustained" him after a "jarring" move from the West Coast. (Lttr. of Metin Ozkuzey, attached hereto as Ex. 29.) Orhan Taner credits Erden for teaching him how to become a "thoughtful, value-driven parent[]." (Lttr. of Orhan Tanner, attached hereto as Ex 30.)

Many friends write about Erden's support during a time of personal crisis. Tamer Seckin describes Erden's daily help with food, errands and "even caring for my elderly father who was visiting" while he was convalescing from a serious medical procedure. (Lttr. of Tamer Seckin, attached hereto as Ex. 31.) Mehmet Nakas discusses Erden's "generous support" in making "us stronger than before" after his business was "devastated by a flood" and had to be rebuilt. (Lttr. of Mehmet Nakas, attached hereto as Ex. 32.) Baris Ozturk recalls how Erden drove to a "remote location" during a weekend to bring crutches after Mr. Ozturk had suffered a sports accident. (Lttr. of Baris Ozturk, attached hereto as Ex. 33.)

Erden's generosity extends to strangers.  Aycan Sancak, a family nanny, writes that Erden "led the charge on fundraising to get [her roommate] the care she needed in NYC and then to fly her comfortably back to Turkey." (Lttr. of Aycan Sancak, attached hereto as Ex. 34.)  In addition, a film director, Zishan Ugurlu, writes that Erden's "financial, logistical and emotional [generosity] . . . has been critical to the survival and success of the Turkish artistic community." (Lttr. of Zishan Ugurlu, attached hereto as Ex. 35.)  Examples abound from several local artists and philanthropists. (*See, e.g.*, Lttrs. of Serder Ilhan, Christian Karavolas and Elif Onural, respectively attached hereto as Exs. 36, 37 and 38.)

Erden's generosity continues in the face of national crises, which explains why Mr. Ozturk writes that "Erden embodies the spirit and resilience of a true New Yorker." (Lttr. of Baris Ozturk, attached hereto as Ex. 33.)  Immediately following 9/11, Erden went with a team of workers and "heavy machinery" from his company to assist in the recovery efforts at Ground Zero.  (Lttr. of Patricia Rice, attached hereto as Ex. 23.)  In response to COVID-19, Erden went "door to door" in Queens to deliver "food and medicine" to many who "were too scared or isolated to leave home." (Lttr. of Tamer Seckin, attached hereto as Ex. 31.)  After Hurricane Sandy, Erden made "crucial contributions" to provide "essential supplies" to those in need.  (Lttr. of Baris Ozturk, attached hereto as Ex. 33.)

Erden has been caring and creating opportunities for people to better themselves for many years.  This is assuredly not a cynical case where a defendant facing sentencing suddenly becomes a model citizen.  The simple fact is that throughout his life, Erden Arkan has always – of his own accord – striven to help others find success in life without any expectation for anything in return.[2]

---

[2] Counsel received so many letters of support for Erden Arkan from family, friends, former colleagues, beneficiaries and community leaders that each letter could not be specifically referred to in this Memorandum.  Many, though not all, of these additional letters have been compiled together and are attached hereto as Ex. 39.

As Ms. Durukan so eloquently writes, Erden's "kindness, fairness, and willingness to help others are not just admirable qualities; they are at the core of who he is." (Lttr. of Funda Durukan, attached hereto as Ex. 27.)

### D.    <u>Charitable Works</u>

In addition to his quiet acts of kindness and generosity that Erden has displayed throughout his entire life, Erden has been active in charitable foundations. For example, in 1997, Erden co-founded the Turkish American Business Forum ("TABF"), a non-profit organization which fosters business opportunities and connection in the tri-state area for Turkish Americans. (Lttr. of Ben Yakut, attached hereto as Ex. 40.) With approximately 3,000 members, TABF helped Turkish American entrepreneurs grow New York City's economy without losing their cultural identity. (*Id*.)

According to a TABF co-founder, Erol Benjenk, TABF's "growth and success would not have been possible without [Erden]." (Lttr. of Erol Benjenk, attached hereto as Ex. 41.) Erden wrote TABF's bylaws (Lttr. of Nurseli and Mustafa Seker, attached hereto as Ex. 42), served on its Board (Lttr. of Ben Yakut, attached hereto as Ex. 40), and organized events which gave "members access to influential figures in real estate, finance, and retail-connections that would have been difficult . . . to forge" without Erden's support. (Lttr. of Erol Benjenk, attached hereto as Ex. 41.) In addition, Mr. Taner, a TABF co-founder, credits Erden's "vision and insistence that TABF remain fully independent—free from any political, domestic, or foreign government affiliations" for TABF's "credibility and long-term success." (Lttr. of Orhan Taner, attached hereto as Ex. 30.)

Through TABF, Erden played a critical role in helping integrate young Turkish American entrepreneurs into corporate America. As a "young architect just starting out in New York City,"

Tamir Demircioglu, like other young entrepreneurs, relied on TABF's "invaluable" networking events to find "our footing in a competitive and unfamiliar environment. . . ." (Lttr. of Tamir Demircioglu, attached hereto as Ex. 43.) Similarly, Nilufer Durak writes about Erden's use of TABF to "open doors that might have stayed shut" for Turkish American women. (Lttr. of Nilufer Durak, attached hereto as Ex. 44.) A successful business executive n Boston, Ms. Durak credits Erden for his "unwavering belief in community," which "[i]n the sometimes-lonely hustle of New York City," turned Erden into "a big brother to many of us." (*Id.*)

In addition, Erden devoted substantial time and resources to another collaborative non-profit, the Society of Turkish American Architects, Engineers, and Scientists (Lttr. of Zeynal Alhan, attached hereto as Ex. 45) and the Turkish Philanthropy Funds ("TPF") (Lttr. of Erman Agirnasli, attached hereto as Ex. 46), among other charities. A business colleague of Mr. Arkan, Burak Alpaslan, recalls Mr. Arkan's "instrumental" role in making phone calls to raise funds for TPF to feed and clothe the survivors of a tragic earthquake in Turkey. (Lttr. of Burak Alpaslan, attached hereto as Ex. 47.)

Animated by a sense of servant leadership, Erden has spent a lifetime in philanthropy without seeking credit or recognition.

### E.    Collateral Consequences

This case has drawn significant negative attention from major news outlets. An internet search of Erden Arkan's name results in pages of articles announcing his conviction for "Illegal Contributions."[3] Television coverage of Mr. Arkan's plea hearing included a "perp"-type walk

---

[3] *See*, e.g., Brooklyn real estate magnate pleads guilty to conspiring to funnel illegal donations to NYC Mayor (https://apnews.com/article/nyc-mayor-adams-new-york-4169e543f2165a3fa43c859e66b344ff) (January 10, 2025); Donor Pleads Guilty to Making Illegal Contributions to Adams Campaign (https://www.nytimes.com/2025/01/10/nyregion/adams-corruption-businessman-plea.html) (January 10, 2025); Turkish businessman admits to illegally steering funds to Mayor Eric Adam's 2021 campaign

from the courthouse while encircled by a parade of photographers and reporters.[4]

Erden's sense of humiliation is acute.  As Itir writes,

> This past year has brought unimaginable pain and reflection.  Eden has expressed to me, over and over again, how deeply sorry he is for the mistake he made.  I have seen the weight of that remorse in every gesture, in his silence, in his sleepless nights.

(Lttr. of Itir Arkan, attached hereto as Ex. 2.)

Erden's suffering cannot be fully measured without taking stock of his well-earned reputation and role in the Turkish American community.  Based on his decades-long record of community-building and service, Erden "stood out" as a "figure of quiet strength, grace, and unwavering integrity."  (Lttr. of Arzu Ertas, attached hereto as Ex. 48.)  Erden's "rare mix of knowledge, kindness and integrity" (Lttr. of Tahir Erimli, attached hereto as Ex. 49) explains why "[e]veryone – young and old – refers to him as 'Erden Abi.'"  (Lttr. of Ismet Ertas, attached hereto as Ex. 50.)

> In Turkish, "abi" means "older brother," but it carries a deeper cultural meaning — it reflects respect, warmth, trust, and an honored place in our hearts and communities.  At 65 years old, I can say with certainty that Erden Abi is one of only a few people in my life who has truly earned this title.  (*Id*.)

Reflecting his privileged status in the Turkish American community, 'Erden Abi' has been asked by others to mediate business disputes between third parties (Lttr. of Arzu Ertas, attached hereto as Ex. 48) and offer opinions on business transactions in which he was a disinterested party (Lttr. of Tahir Erimli, attached hereto as Ex. 49.)

---

(https://nypost.com/2025/01/10/us-news/turkish-businessman-admits-to-illegally-steering-funds-to-mayor-eric-adams-2021-campaign/) (January 10, 2025); Turkish-born construction executive named in Adams indictment to plead guilty (https://www.politico.com/news/2024/12/23/turkish-construction-executive-adams-indictment-guilty-plea-00195930) (January 10, 2025).

[4] *See* Eyewitness New ABC 7, "Turkish-born construction executive named in Mayor Adams indictment pleads guilty to federal charges," (https://abc7ny.com/post/nyc-mayor-adams-corruption-case-erden-arkan-pleads-guilty-making-straw-donations-2021-mayoral-campaign/15787216/) (January 10, 2025).

As a result of this case, Erden has suffered a colossal fall. "Erden Abi" has a new, more widely known moniker: corrupt Brooklyn real estate magnate. In truth, Mr. Arkan, forced to sell his "beloved" home in Turkey for financial reasons related to this case (Lttr. of Itir Arkan, attached hereto as Ex. 2), is hardly the real estate "magnate" which the media depicts.

Nevertheless, since this case began, Erden has been focused on taking care of his family. This has been difficult in large part because of the profound shame and humiliation which he feels. However, Mr. Arkan has always been an optimist and is committed to resuming his purposeful life by finding ways to contribute to the greater good.

## II. The Guidelines Recommendation of Probation is Reasonable

### A. Applicable Legal Standard

District Courts must consider the Guidelines but should "tailor the sentence in light of other statutory concerns as well." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Specifically, the Court must determine the appropriate sentence by considering all the factors set forth in the 18 U.S.C. § 3553(a). A sentencing court must "impose a sentence that is sufficient, but not greater than necessary, to comply" with the purposes of the sentencing statute. (*Id*.)

### B. The Conduct at Issue

As established during the plea hearing, Mr. Arkan has accepted responsibility for the conduct at issue in this case. Mr. Arkan accepts that he exhibited poor judgment. However, Erden's motivation to act in the way that he did defies reductionistic platitudes that grab headlines.

#### 1. Erden's Motive to Host Fundraiser

In April 2021, when New York City was struggling to recover from COVID, Erden agreed to host a fundraiser for the campaign. Erden's sole objective was simple: to present a letter to Mr. Adams on how the City's next mayor could improve the quality of life for its residents. (Lttr. to Eric Adams, attached hereto as Ex. 51.) Mr. Arkan's letter, including its

17

focus on "[l]owering crime," "[c]leaning the [s]treets" and "[c]utting the red tape," reflects the existential struggles of everyday New Yorkers (*id*.), who were then dealing with a crime wave and an affordable housing crisis.[5]

More important than discrete public policy concerns, the letter reflects Mr. Arkan's deep, visceral connection to his home, New York City.

> Many of us here today are immigrants to this beautiful city. We came to this bursting metropolis with just a few dollars and many ambitions. In the decades that passed, we have built many successful businesses, feeding and clothing not just our families but the families of thousands of other hard working men and women who helped us build this city, brick by brick. We speak for them today as well when we ask for your help in allowing New York City to thrive . . . . (*Id*.)

During the fundraiser, Mr. Arkan gave his letter to Mr. Adams. Aside from his personal donation, his letter was the only document which he held or received that entire night.

### 2. Erden's Motive to Use Straw Donors

To guarantee Mr. Adams' personal appearance at the fundraiser, Erden was told that the campaign required a commitment of $15,000 in total contributions. Agreeing to the campaign's condition, Erden scheduled the fundraiser for May 7, 2021.

To meet the campaign's funding threshold, Mr. Arkan initially relied on his network of construction contractors. On April 10, 2021, an email was sent to several contractors, including Selim Akyuz, whose refusal and Mr. Arkan's acceptance of that refusal "with grace" were representative of Mr. Arkan's initial fundraising efforts. (Lttr. of Selim Akyuz, attached hereto as

---

[5] *See, e.g.*, AMNY, "NYPD reports 30% crime surge in April due to robberies, grand larcenies and assaults," (https://www.amny.com/news/nypd-crimes-statistics-april-2021/#:~:text=Police%20&%20Fire-,NYPD%20reports%2030%25%20crime%20surge%20in%20April%20due,rob beries%2C%20grand%20larcenies%20and%20assaults&text=An%20NYPD%20officer%20tapes%20off%20thand) (May 5, 2021). *See also* City Limits, "NYC's Latest Vacancy Survey is Bad News for Affordable Apartment-Seekers," (https://citylimits.org/nycs-latest-vacancy-survey-is-bad-news-for-affordable-apartment-seekers/) (reviewing 2021 data to declare an "extreme vacancy shortage," among other things) (May 17, 2022).

Ex. 52.) On April 27, 2021, a second email was sent to an even larger group of construction contractors. The results, however, were the same. From his two emails, Erden only received $1,000 in commitments.

Fearing embarrassment from the now impending fundraiser, Erden pivoted to a new strategy. Ten employees would each make a $1,250 campaign donation. Simple math makes Erden's motive: $12,500 (employees) + $1,500 (Erden) + $1,000 (construction contractors) = $15,000. Some additional math does the same: $1,250 exceeds the $250 cap on city matching funds by a four-fold. Erden used straw donations to fill his fundraising gap.

Consistent with Erden's character, however, numbers do not fully explain his conduct. After all, Erden, not his employees, made the fundraising commitment to the campaign. Acutely aware that his employees enjoyed far less earning power than the construction contractors on whom he had initially expected to rely, Erden was uncomfortable with the former paying out of their smaller pockets to fulfill his campaign pledge. On April 28, 2021, the very next day after the failed second email to the construction contractors, Erden used his personal funds to finance ten checks in the amount of $1,250 to his employees. Although misguided, Erden acted to avoid what he saw as an unfair imposition on his employees.

Importantly, Erden's motivation has a precedent from his prior business dealings. During the 2008 credit crisis, according to Mr. Murat Agirnasli, Erden refused to approve a "cash call" to investors, and, thereby, put his personal stake in an investment at risk. (Lttr. of Murat Agirnasli, attached hereto as Ex. 18.)

> [Erden] said, "If someone can't participate right now, they shouldn't be diluted. These people trusted us with their savings. We must protect them." He insisted that we find another solution [to a lending freeze], even if it meant sacrificing from our own shares. (*Id.*)

Analogous to 2008, Erden was motivated in this case to avoid a perceived economic harm to those whom he knew had placed their trust in him.[6]

## C.    The Unprecedented Posture of this Case

It should never have been Mr. Arkan holding the bag for Mayor Adams.  Mr. Arkan acknowledges that he acted illegally.  However, Mr. Arkan's acceptance of responsibility cannot validate the invalid.

The Adams case was the centripetal force which dictated every turn in this case.  In October 2024, in Manhattan, then candidate Trump was speaking at a charity event where he turned to Mr. Adams and said, "We were persecuted, Eric.  I was persecuted, and so are you, Eric."[7]  Thereafter, during the 2024 end-of-the-year holiday season, the government executed a plea agreement and scheduled a plea hearing on January 10, 2025, a mere ten days before President Trump's inauguration.

Remarkably, the government's frantic push to convict Mr. Arkan had nothing to do with proving the merits of the Adams case, which involved alleged corruption in "the form of illegal foreign influence on our democratic system."  *See* DOJ Press Release, "New York City Mayor Eric Adams Charged with Bribery and Campaign Finance Offense" (September 26, 2024).  Critically, the government's plea agreement with Mr. Arkan includes no provision for his cooperation, a fact which underscores the government's awareness that Mr. Arkan has no knowledge of "illegal foreign influence" of any kind in the campaign.

---

[6] Notwithstanding Mr. Arkan's benevolent motivation, his conduct negatively impacted New York City's Public Matching Program in the amount of $18,000.  (PSR ¶ 10).  Consistent with Mr. Arkan's unequivocal acceptance of responsibility, the defense relies on Mr. Arkan's motivation as mitigation.

[7] New York Times, "What a Trump Presidency Might Mean for Mayor Adams's Criminal Case," (https://www.nytimes.com/2024/11/10/nyregion/adams-trump-prosecution-election.html) (November 18, 2024).

Instead, this case has everything to do with a media campaign to buttress a beleaguered prosecution of Mayor Adams against the perceived headwinds from a then incoming administration. During the plea hearing, unbeknownst to defense counsel, the prosecutors proffered that the "scheme was planned in consultation with the Turkish Consulate." Transcript of Plea Hearing on January 10, 2025 (ECF Document No. 5 at p.24.) This was false. Mr. Arkan did not "coordinate" his decision to use straw donors, the scheme at issue in this case, with the Turkish Consulate or any Turkish official. In fact, Mr. Arkan only made the decision to use straw donors weeks after he had already spent weeks vainly fundraising from business contractors. Conflating Mr. Arkan's agreement to host a fundraiser, which arose from an invitation from an official at the Turkish Consulate,[8] with his later decision to use straw donors, the prosecutors' media campaign relied on nothing more than a non-sequitur. Moreover, Mr. Arkan's well-known public opposition to the autocratic rule of Turkey's present government makes the government's assertion not only counter factual but fantastic. (Lttr. of Ali Sarikaya, attached hereto as Ex. 53.)

While others who used straw donors to funnel donations into the 2021 campaign were prosecuted in state court by the Manhattan District Attorney's Office (*see* https://manhattanda.org/d-a-bragg-announces-indictments-in-major-campaign-finance-fraud-scheme/),[9] Mr. Arkan was treated differently. This difference was based on an ambition to protect the Adams case from the specter of an early demise.

---

[8] A number of Turkish American leaders received the invitation, which asked participants to attend a meeting where civic issues would be discussed. Mr. Adams' name was not mentioned in the invitation to Mr. Arkan.

[9] Some defendants pled guilty to misdemeanors while another pled guilty to a felony pursuant to a plea agreement requiring a $500 fine and 200 hours of community service. The City, "Third Eric Adams Fundraiser Pleads Guilty in Phony Donations Scheme, as Campaign Reviews 'Exhaustive System of Checks,'" (https://www.thecity.nyc/2024/02/05/eric-adams-dwayne-montgomery-straw-donors/) (February 6, 2024).

It may be true, as the adage goes, that 'consistency is the hobgoblin of small minds,' but the government's pivot from the Adams dismissal to Mr. Arkan's sentencing lacks precedent and is unfair. The government's characterization of Eric Adams as a "tainted prosecution" (*see* Lttr. of Acting Deputy Attorney General Emil to Danielle Sassoon, dated February 13, 2025) calls into question any bona fide federal interest in Mr. Arkan's continued prosecution in federal court. Moreover, there can be no doubt that Mr. Arkan is a proud Turkish American with an unimpeachable record of community building and loyalty to this country, a near octogenarian, with no criminal record, who, as a matter of personal conscience, personally financed a paltry amount of the total value of the alleged benefits at issue in the Adams Indictment with a wish to do some good for the city he calls home.

## III. CONCLUSION

Mr. Arkan's case provides a tragic example of how someone so successful and so admired can lose virtually everything he has built by violating the law. For all the foregoing reasons, we respectfully request that the Court accept probation's recommendation of one year probation. We further ask that his passport be returned to Mr. Arkan and Mr. Arkan be allowed to travel to Turkey during his probationary term for the limited purposes of arranging the sale of his personal residence and attending to other significant family matters.

Dated: August 1, 2025

Respectfully submitted,

_____
Jonathan Rosen, Esq.
Potomac Law Group, PLLC
1717 Pennsylvania Avenue, NW, Suite 1025
Washington, DC 20006
Tel: (202) 321-3416 Fax: (202) 318-7707
jrosen@potomaclaw.com

*Counsel for Erden Arkan*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record who have appeared in this case on behalf of the parties will receive the Court's notification of electronic filing.

_____
Jonathan Rosen, Esq.